IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 JUL 14 PM 4:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| CHRISTOPHER L. FINCH, | } |
| Plaintiff, | } |
| v. | } CIVIL ACTION NO. |
| | } 02-AR-1675-S |
| BANKHEAD RAILWAY SERVICES, INC., | } |
| Defendant. | } |

ENTERED
JUL 14 2003

## MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by defendant, Bankhead Railway Services ("Bankhead"). Plaintiff, Christopher Finch ("Finch"), a black male, asserts two claims: (1) that Bankhead's layoff of him on September 21, 2001 was based on his race, and (2) that he was subjected to a racially hostile work environment. The motion for summary judgment is due to be granted.

### Statement of Undisputed Facts

Bankhead contracts with certain railroads to perform welding services for them. Because welding is performed outside, business is slow in the winter months, thus resulting in layoffs in the late fall. Work increases as the weather warms up, resulting in recalls in the spring. Finch contends that the decision to lay him off in September 2001 was discriminatory in that white welders with less seniority were either not laid off or were recalled. However, Finch cannot identify with any specificity the dates and times during which he was allegedly laid off.

Finch was hired on January 19, 1998. He was laid off for lack of work the first time on

December 20, 1998. On February 1, 1999, when work increased, he was recalled. On October 5, 1999, he resigned his employment without notice. He was rehired September 5, 2000 until another layoff on November 18, 2000. Finch was then recalled on May 6, 2001 and worked until September 19, 2001 when he was laid off when one of Bankhead's major customers significantly reduced work for the remainder of the year due to budget constraints. On the occasions Finch was laid off, Bankhead also laid off other employees, including white employees.

      Bankhead claims its layoff and recall decisions were not based on seniority. Neither party refers to a collective bargaining agreement, meaning that there was no binding seniority provision. Because Bankhead performs work all over the country its work crews must travel. While Finch worked with Bankhead he worked on jobs in Pittsburgh, Pennsylvania, Tennessee, Chicago, Michigan, Ohio, Indiana, Alabama, Georgia, and North Carolina. Bankhead pays its employees for travel time. Therefore, to minimize expenses in putting crews together, Bankhead attempts to use crews made up of individuals who live as close to the job sites as possible. The only one of Bankhead's welders living farther south than Finch is Lee Drummond ("Drummond").

      In attempting to put crews together, Bankhead experienced difficulty reaching Finch. Finch admits that there was a certain time that he was supposed to call in to talk to Bankhead each week about assignments and that sometimes he was unable to do so. Finch further admits that he was chastised for not contacting the office during the scheduled time to find out about future assignments. Finch frequently did not have a working phone number. Bankhead had a number for Finch's sister and for a convenience store where Finch could receive messages, but often Bankhead needed to make contact with employees at night and on weekends and could not

wait to hear back from Finch before he needed to contact someone else who was more easily reachable and who could provide immediate assurances that they would work a particular job. In addition, Finch was periodically required to meet with his probation officer in Alabama. Rather than to send Finch to jobs from which he would need to return before completion, Bankhead would select someone who was available to work the entire job. Bankhead also claims that Finch was thought of as unreliable by some of its customers and he also frequently ran late to meet the company truck. All of these factors affected both Bankhead's willingness and ability to assign Finch work and recall him from layoffs.

  What Finch perceived as unfair about the layoffs was that he was sent home when others were not. The particular layoff about which Finch complained in his deposition occurred when he was sent home from a job in Pittsburgh when he believes Steve Keller ("Keller"), who is white, should have been sent home. The underlying incident took place at a laundry mat. Keller had been drinking and was rude to some people. Finch asked him to show some respect and in response Keller told him to "shut the f-ck up you wigger." Apparently, "wigger" is a term used to describe a black person that wants to be white. A woman at the laundry mat called the police and Keller ran away. When Bankhead learned about the incident, it sent Keller home and suspended him for the remainder of the week and the following week without pay. However, within a day or so of this incident, Bankhead's customer informed Bankhead that it was reducing work and that all of Bankhead's employees on these crews were to be sent home. Finch, along with other employees, were laid off shortly after this incident because of lack of work going into the winter months. Finch was recalled the next spring and worked until his last layoff in September 2001, which is the subject of his complaint.

Finch also alleges that he was subjected to a racially hostile work environment. He claims he was called a "nigger" almost everyday. The first time Finch felt he had been discriminated against was when he went to meet Jonathan Robertson ("Robertson") and Robertson refused to shake his hand and stated that he did not touch "niggers." Prior to this time, the only problem Finch had was when he first started and his foreman did not report an injury Finch suffered and called him a "gopher." The foreman thought Finch was joking about the injury. Finch admitted in his deposition that this incident was not an act of discrimination.

The next possible racial incident occurred when Finch worked on a job in Chicago with Paul Gann ("Gann"). During the eight day trip, Gann used the word "nigger" repeatedly in front of Finch. On the eighth day, Finch complained about Gann's conduct. Gann was sent home the next day. Finch never had to work with Gann again. Another racial incident Finch recalls occurred in Michigan. Robertson refused to share a room with Finch. Finch wanted to confront Robertson about his attitude but a coworker stopped him. Finch also took offense to Robertson's mumbling while looking at Finch while they were working together. Finch could not identify what was being said. During this same trip, Finch was at a bar talking to a woman who Finch claims wanted to go home with him when a coworker told him to go away and started talking to the woman in Finch's place. Finch believes this incident was racially motivated because he was the only black person at the bar.

Another incident which Finch complains of occurred when a coworker told him that he was acting like a "bitch." Finch claims this comment was racially motivated because this man previously commented that no black people live near him. On another occasion, Finch had two white female friends visit him while he was in Pittsburgh. A coworker told them they did not

need to "be with that nigger." Then, later, the same coworker confronted Finch about sleeping in the van when he had no money and told Finch that he was to be sent home because he slept in the van. The same coworker also said that Finch was "from the wrong side of the bridge." Finch asked if this was a reference to the color of his skin and the coworker told him he could take it however he wanted. A white employee testified that he heard white employees make the same comment to other white employees. He testified that it merely distinguished the Tennessee employees from others residing farther south. On a few occasions, a coworker asked Finch "what's up, my nigger?" After Finch told him to stop he stopped. Once a coworker referred to Finch as "blue." Finch also testified that he also heard coworkers say "I love to see a black man bleed" when he was sweating.

      Although he claims he was discriminated against in the disbursement of advance per diem payments for living expenses, Finch admits that there were times when he chose to sleep in the company van rather than spend his money on a hotel room so he could save money. Finch also claims that white employees were able to get "com checks" and he could not. Finch admits that he did receive these pay advances, but kept no records of when he received them. Finch complains in particular about an incident when he claims he was unable to obtain a com check advance. Finch admits that when he first went to work on this occasion, he received a com check advance. He thought he was supposed to receive an additional advance at the end of the second week and did not. The only person Finch knows to have received a com check advance was Tim Holt, who received one a few days before Finch's request for one. Bankhead claims it is its policy and practice that when an employee is first hired or first recalled from layoff, Bankhead provides the employee per diems, in advance, until the employee receives a first paycheck. After

5

the employee receives the first paycheck, from then on the per diems are paid in their paychecks, not as an advance. Bankhead contends that Finch actually received more per diem advances than other employees. Finch received per diem advances in the amount of $5,997.40 during his employment with Bankhead. It is not clear how this number compares to the amount of per diem advances other employees obtained. On the one occasion that Finch complained about not receiving a check, he received a check with a letter of apology by overnight mail.

## Analysis

Finch alleges that he was unfairly left off work crews and given less work hours than his white counterparts. Bankhead maintains that Finch cannot succeed on his disparate treatment claim related to his layoffs and job assignments. To establish a prima facie case of disparate treatment the plaintiff must show that (1) he belongs to a protected class; and (2) he was similarly situated to a person who was not a member of the protected class; but (3) he did not receive a condition of employment provided to that person. *Thompson v. Morris Brown College*, 752 F.2d 558, 562 n.7 (11th Cir. 1985). Where direct evidence of discrimination is unavailable the courts review a Title VII plaintiff's claim using the familiar *McDonnell Douglass/Burdine* three-step burden shifting framework. Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). If a prima facie case has been shown, the defendant must articulate some legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 802. If this is accomplished, the plaintiff may attempt to demonstrate that the proffered reason is in fact merely a pretext for the defendant's proscribed conduct. *Id.*

Bankhead claims that Finch is unable to establish the third element of his prima facie

case. In his deposition, Finch identified Robertson as a comparator whom he helped to train. Robertson was allegedly recalled from layoff when Finch was not. However, Robertson and Finch were not similarly situated. As previously discussed, there were matters which affected Bankhead's ability to assign Finch work, including his location in south Alabama, the difficulties contacting him, the requirement that he return to Alabama, and his history of being late to meet the company truck. There is no evidence that there were similar issues involving Robertson or other white employees. Moreover, Finch's reliability was not well regarded by certain customers. Therefore, Finch cannot establish that he was treated less favorably than any **similarly situated** white employee.

Assuming *arguendo* that Finch can establish a prima facie case, he has not rebutted Bankhead's legitimate, non-discriminatory reasons for not recalling him. Bankhead's business is cyclical, with layoffs generally occurring in the fall. Bankhead did not recall Finch from his last layoff for a variety of reasons. Finch lives farther south and has to travel farther than other employees. Bankhead generally places employees who are as close as possible to the job at issue to avoid increasing travel costs. Because Finch was viewed as not as reliable as other employees, he is not qualified to work on as many jobs as other employees. Finally, Bankhead had experienced problems with Finch's availability. Finch did not present any evidence to create a genuine issue of material fact regarding whether each of the defendant's articulated reasons is pretextual. Finch merely makes conclusory allegations that he was unfairly left off work crews and that the fact that he was denied work coupled with the racial slurs present on the job site indicates that race may be a factor. Bankhead is entitled to summary judgment on Finch's disparate treatment claim.

Finch also claims that during his employment he was subjected to numerous incidents of racially harassing behavior. Bankhead claims that Finch cannot establish that he was subjected to an actionable hostile work environment. To establish a hostile work environment claim a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim).

Looking at the totality of circumstances, the following events occurred during the span of time between January 1998 and September 2001 during which Finch worked for Bankhead:

1. Prior to October 1998, Finch was called a "gopher."Finch admits this was not discriminatory.
2. In October 1998, a coworker refused to shake Finch's hand and stated that he did not touch "niggers."
3. While on a job in Chicago, a coworker used the word "nigger" repeatedly in front of Finch. When Finch complained the coworker was sent home and Finch never saw him again.
4. A coworker refused to share a room with Finch and mumbled something while looking at him.
5. A coworker told Finch he was acting like a "bitch."
6. A coworker told Finch that two white females friends visiting him that they did not need to "be with that nigger." That same coworker also confronted Finch about sleeping in the van and commented that Finch was from the "wrong side of the bridge."
7. On a few occasions, a coworker as Finch "what's up, my nigger?" When Finch asked him to stop he stopped.
8. A coworker referred to Finch as "blue."
9. A couple of coworkers said "I love to see a black man bleed" when Finch was sweating.
10. Finch heard the word "nigger" used on other occasions.

8

Bankhead argues that the first two of these incidents are not within the statutory period of limitations, having occurred almost four years before Finch filed his complaint in July 2002. Finch did not respond to this argument, but the court considers these incidents as backgroun evidence. Assuming that the timing of the other events falls within the statute of limitations, some of the remaining events have no connection to race other than Finch's own speculation. These events include: a coworker telling Finch he was acting like a "bitch," a coworker confronting Finch about sleeping in the van and commented that Finch was from the "wrong side of the bridge," and a coworker referring to Finch as "blue." Thus, Finch's alleged hostile work environment claim is made up of mere sporadic offensive utterances, occurring over a couple of years-- some of which that did not even occur at work.

Bankhead further argues that these incidents were infrequent and even if found to be frequent, none of them were either severe or physically threatening. Finch claims that the harassment was pervasive because the crews were nearly together 24 hours a days seven days a week. Bankhead contends that harsh language used by employees welding rails cannot be judged in the context of what would be appropriate in other work environments. Bankhead points out that although the language and co-employees' attitudes may be harsh, they are not what a reasonable person in the plaintiff's position would find severely hostile or abusive. *See Oncale v. Sundownder Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). Furthermore, by arguing that the use of the word "nigger," in and of itself, creates a hostile work environment, Finch ignores the legal precedent governing this case.    The "'mere utterance of an . . . epithet which engenders offensive feelings of an employee' . . . does not sufficiently affect the conditions of employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Savings*

*Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe to alter the conditions of the employment and create an abusive working environment'" is the law violated. *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 65-66). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's performance at work." *Underwood v. Northport Health Services Inc.*, 57 F. Supp 2d. 1289, 1302-03 (M.D. Al. 1999). "The racial slurs allegedly spoken by co-workers [have] to be 'so commonplace, overt, and denigrating that they create an atmosphere charged with racial hostility." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Finch is unable to establish that the environment was objectively hostile, much less that he subjectively believed his environment as hostile and abusive. He testified that he loved his job. He was also performing well, thus he cannot establish that the terms and conditions of his employment were altered. Speculation on Finch's part is insufficient to allow his hostile work environment claim to survive summary judgment. A plaintiff's self-serving, speculative testimony that he was subjected to certain behavior because of his race . . . does not, as a matter of law, create a genuine issue of material fact. *See Wadibia v. Auburn University*, 1999 U.S. Dist. LEXIS 14122, *30-31 (S.D. Ala. 1999). Because Finch has not offered proof that could establish all of the required elements of his hostile work environment claim, Bankhead is entitled to summary judgment on the hostile environment claim.

   Finch alleges unequal payment of advances and per diem pay (com checks). Finch claims that "the com check issue while somewhat unclear, is at least further evidence as to the hostile

work environment and the adverse treatment finch worked in." However, Finch has presented no evidence either that he was not provided with com checks according to Bankhead's policies or that any alleged discrepancy was because of his race. Pursuant to Bankhead's policy, Finch was only entitled to com checks upon returning from a layoff or when rehired. Finch received com checks on both these and other situations. The mere fact that he was unable to manage his money and ran out at times does not entitle him to additional advances. The evidence establishes that he was advanced per diems like any other employee. Finch has nothing other than his own speculation to support his allegation that he was discriminated against with respect to per diems which is insufficient to establish pretext or create a genuine issue of material fact.

## Conclusion

By separate order, the court will grant Bankhead's motion for summary judgment.

DONE this 14th day of July, 2003.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT